In the Matter of the Application of the MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK to Acquire Title to Certain Lands as Part of or an Extension of Riverside Park.

HERMAN C. VON POST et al., Appellants; THE CITY OF NEW YORK, Respondent.

MUNICIPAL CORPORATIONS — NEW YORK (CITY OF) — RIPARIAN RIGHTS — LANDS UNDER TIDEWATERS OF HUDSON RIVER — PRESUMPTION THAT CITY DID NOT INTEND TO INCLUDE SAME IN CONVEYANCE OF UPLANDS BOUNDED BY RIVER.   Under a grant, or charter, from a colonial governor, acting for his majesty, the king of England, which conveyed to the city of New York all waste, vacant, unpatented and unappropriated land lying within the city and on Manhattan island, extending to and reaching low-water mark, through all parts of the city and Manhattan island, with power and jurisdiction over the same, together with all bridges, docks or wharves, and ferries then existing, with the rights, profits and benefits pertaining thereto, it must be deemed that the tideway, or land between high and low-water mark, was conveyed to the city in trust to hold and control the same in the interest of commerce and of the public; and where the city subsequently conveyed, to a private owner, certain uplands abutting upon land under water, described as bounded by the Hudson river, with no words indicating any intent to convey the land under water, it must be presumed that the city in its exercise of sovereign power as a municipality only intended to include in the conveyance the uplands to high-water mark, retaining the tideway and land under water as trustee of the public domain in the interest of commerce and the state.

*Matter of Mayor, etc., of New York,* 102 App. Div. 615, affirmed.

(Argued June 2, 1905; decided October 3, 1905.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered February 16, 1905, which affirmed an order of Special Term confirming the report of commissioners of appraisal in the above-entitled proceeding.

The facts, so far as material, are stated in the opinion.

*William C. Beecher* and *Bache McE. Whitlock* for appellants.   The rule that a deed of land fronting on a navigable

stream conveys only to high-water mark applies only to a grant from the sovereign, to a private grant, where the grantor cannot prove that the title to the land below high-water mark is not still in the sovereign, and to particular instances where the circumstances raise the presumption that the grantor intended not to grant the land under water. (Hale's de Jure Maris, ch. IV, ii (1) [Hargrave's Law Tracts, 12]; *Ex parte Jennings*, 6 Cow. 518, note; 3 Kent's Comm. *427, *431, *432; *Furman* v. *Mayor, etc.*, 10 N. Y. 567; *People* v. *Tibbetts*, 19 N. Y. 523; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Mayor* v. *Hart*, 95 N. Y. 443; *Sage* v. *Mayor, etc.*, 154 N. Y. 61.) There is a distinction to be drawn between the proprietary and jurisdictional rights of the sovereign in the land under water in navigable streams and arms of the sea. (*Smith* v. *City of Rochester*, 92 N. Y. 463; *People* v. *Vanderbilt*, 26 N. Y. 287; *Kingsland* v. *Mayor, etc.*, 110 N. Y. 569; *De Lancey* v. *Piepgras*, 138 N. Y. 26.) The sovereign's jurisdictional rights in this land under water, termed "*jus publicum*" or "the public domain," are inalienable by the sovereign. (*People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Thompson* v. *Mayor, etc.*, 5 App. Div. 424; *People* v. *Vanderbilt*, 26 N. Y. 287; *Matter of City of New York*, 168 N. Y. 134; *Mayor* v. *Hart*, 95 N. Y. 443; *Bedlow* v. *N. Y. F. D. D. Co.*, 112 N. Y. 263; *Sage* v. *Mayor, etc.*, 154 N. Y. 61; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129.) The Dongan charter delegated to the city of New York no right, express or implied, to exercise the *jus publicum* of the crown. The grant of the tideway was of the crown's proprietary interest only. The city did not obtain any authority to exercise the "*jus publicum*" of the crown anywhere on the water-line of Manhattan island, until it obtained the Montgomerie charter of 1730. (*Van Zandt* v. *Mayor, etc.*, 8 Bosw. 375; *People ex rel.* v. *Jessup*, 160 N. Y. 249; *Sage* v. *Mayor, etc.*, 154 N. Y. 61.) If, at the time of the De Kay deed, the authority to exercise the *jus publicum* was not delegated to the city, but remained in the crown, no presumption that the city intended to retain its proprietary rights in the tideway

can arise. (*Van Zandt* v. *Mayor, etc.*, 8 Bosw. 375.) The city was not acting in a governmental capacity in executing the De Kay deed, and that deed must, therefore, be construed as if it were one between individuals. (*Roosevelt* v. *Draper*, 23 N. Y. 318; *Mayor, etc.*, v. *S. A. R. R. Co.*, 32 N. Y. 261; *Story* v. *N. Y. & E. R. R. Co.*, 90 N. Y. 122; *Varick* v. *Smith*, 9 Paige, 546.) The city received a valuable consideration, and, therefore, the De Kay deed must receive the construction which is most favorable to the grantee. (3 Washb. on Real Prop. [5th ed.] 202.) The description in the De Kay deed was such that under it the title to the tideway passed to De Kay. (*Matter of Mayor, etc.*, 20 App. Div. 404; *Walton* v. *Tifft*, 14 Barb. 216; *De Meyer* v. *Legg*, 18 Barb. 14; *Wetmore* v. *Law*, 34 Barb. 515; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574.)

*John J. Delany, Corporation Counsel* (*Theodore Connoly* and *Charles D. Olendorf* of counsel), for respondent. By its grant to Jacob De Kay of July 20, 1701, the city of New York did not divest itself of its title to the tideway. (*Mayor, etc.*, v. *Hart*, 95 N. Y. 443; *Sage* v. *Mayor, etc.*, 154 N. Y. 70; *De Lancey* v. *Piepgras*, 138 N. Y. 26; *Jarvis* v. *Lynch*, 157 N. Y. 445; *Graham* v. *Stern*, 168 N. Y. 517; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574.)

HAIGHT, J. These proceedings were instituted on behalf of the mayor, aldermen and commonalty of the city of New York to acquire the title and interest of all persons interested in the lands and premises, including upland and land under water or rights therein, not then owned by or vested in the mayor, aldermen and commonalty of the city of New York, abutting upon the Riverside drive between 72d street and 129th street.

The lands in question were part of a tract of land which was granted to the mayor, aldermen and commonalty of the city of New York by Thomas Dongan, then lieutenant-governor under his majesty the king of England, by his charter, bear-

ing date the 22d of April, 1686, which grant included the tideway of the lands upon the eastern side of the Hudson river to low-water mark. On the 21st of July, 1701, the mayor, aldermen and commonalty of the city of New York conveyed to one Jacob De Kay a tract of upland abutting upon the lands under water, in dispute, and bounded by the Hudson river, which conveyance was subsequently confirmed by Lord Cornbury, the captain-general of the province, under Queen Anne. In 1839 one William Whitlock became the owner of the lands in question, claiming title through several mesne conveyances to the lands acquired by De Kay from the city in 1701. The claimants derived their title through Whitlock. On November 9th, 1847, Whitlock conveyed to the Hudson River Railroad Company a strip of land sixty-six feet wide across his premises upon the river front for a right of way, a small portion thereof being above high-water mark and the remainder thereof below high-water mark, leaving, however, a narrow strip of the tideway on the lower side thereof unconveyed. Subsequently, the city of New York acquired the lands between the railroad's right of way and the Riverside drive for park purposes and the same is now known as Riverside park.

The rights of claimants depend upon the construction that is to be given to the deed of 1701, by which the city conveyed the uplands abutting upon the premises in question to De Kay. It is contended on behalf of the claimants that under the provisions of that deed De Kay acquired the tideway in front of the uplands described in the deed, and that it was the intention on the part of the city to convey to him all the title that it had to the lands under water, while on behalf of the city it is contended that the lands conveyed were, by the terms of the deed, bounded west by the Hudson river, and that being a navigable river in which the tide ebbs and flows, the presumption arises that high-water mark was intended to be the boundary line. We shall assume for the purposes of this case that, if the conveyance was by an individual who owned the tideway and who had bounded his

deed upon the river, the presumption would be that he intended to include in the conveyance the tideway. (*Smith* v. *Bartlett*, 180 N. Y. 366, and *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574.) But the conveyance in this case, as we have seen, was by a municipal government, the city of New York, and the question arises as to whether a different presumption arises with reference to its deed.

The rights of the sovereign, whether crown or state, to land under water in navigable streams and arms of the sea are doubtless twofold, proprietary and governmental. As proprietor, the sovereign may sell or convey to others, but as to the power to govern, the sovereign holds as trustee for the use of the public, under such laws, rules and regulations as may from time to time be adopted and which shall be deemed to best serve the interests of commerce and the state. These powers may be transferred by the sovereign to local subordinate governments which have been established, constituting such governments the trustees of the public and the guardians of the rights and privileges of the people. The king of England, therefore, during our colonial period had the power to grant a charter to the mayor, aldermen and commonalty of the city of New York, constituting it a body corporate and politic with powers of local government, and to convey to it the lands under water surrounding Manhattan island, on which the city is located. This power the king exercised through his colonial governors, who from time to time have enlarged the powers and jurisdiction of the city. While the king had the power to convey the tideway on the shores of the high seas and navigable rivers, he will not be presumed to have done so by merely bounding the conveyance upon the sea or the river; such conveyance will carry title only to high-water mark. Other words must be employed in the conveyance which would clearly indicate his purpose and intent to convey the lands under water in order to pass the title thereto. (*Trustees of Brookhaven* v. *Strong*, 60 N. Y. 56; *Sage* v. *Mayor etc. of N. Y.*, 154 N. Y. 61; *Mayor etc. of N. Y.* v. *Hart*, 95 N. Y. 443.)

The charter issued to the mayor, aldermen and commonalty of the city of New York in 1686 by Governor Dongan recites that the city of New York is an ancient city, and that the citizens have anciently been a body politic and corporate, and have held, used and enjoyed divers and sundry rights, liberties, privileges, franchises, free customs, pre-eminences, advantages, jurisdictions, emoluments and immunities, as well by prescription as by charter, letters patent, grants and confirmations, not only of divers governors and commanders-in-chief in the said province, but also of several governors, directors, generals and commanders-in-chief of the Nether Dutch nation, whilst the same was under their power and jurisdiction; and the citizens and inhabitants of said city have erected and built at their own costs several public buildings, including a city hall or stadt house, and have constructed a bridge into the dock or wharves and established a ferry between the city and Long Island for the convenience of travelers. He then, on behalf of the king, grants, ratifies and confirms to the mayor, aldermen and commonalty of the city all and every such and the same liberties, privileges, franchises, rights, royalties, free customs, jurisdictions and immunities which they have anciently held, used or enjoyed; provided, always, that none of the said liberties, privileges, franchises, rights, free customs, jurisdictions or immunities be inconsistent with or repugnant to the laws of his majesty's kingdom of England, or any of the laws of the general assembly of the province; the public buildings, with the ground thereunto belonging, two market houses, the bridge into the dock, the wharves or dock, and the aforementioned ferry, with their rights and appurtenances, together with all the profits, benefits and advantages which shall or may accrue and arise at all times hereafter, for *dockage or wharfage,* within the said dock, with all and singular the rents, issues, profits, gains and advantages, which shall or may arise, grow or accrue by the said city hall, or stadt house, and ground thereunto belonging, market houses, bridge, dock, burying place, ferry; together with full power, license and authority to the said mayor,

aldermen and commonalty, and their successors forever, to establish, appoint, order and direct the establishing, making, laying out, ordering, amending and repairing of all streets, lanes, alleys, highways, watercourses, ferry and bridges, in and throughout the said city and Manhattan island, needful and convenient for the inhabitants and for all travelers and passengers, is likewise granted, ratified and confirmed unto all the inhabitants of the city and of the island. He then grants to the mayor, aldermen and commonalty of the city all the waste, vacant, unpatented and unappropriated lands lying within the city and on Manhattan island, extending and reaching to low-water mark through all parts of the city and Manhattan island, together with all rivers, rivulets, coves, creeks, ponds, waters and watercourses. Also to the officers of the city and their successors forever, the right to extend itself, as well in length and in breadth as in circuit, to the farthest extent throughout Manhattan island, and in and upon all the rivers, rivulets, coves, creeks, waters and watercourses belonging to the island as far as low-water mark, and jurisdiction over the same, " without the let, hinderance or impediment of me or any of my successors, governors, lieutenants or other officers whatsoever." He creates the offices of mayor, chamberlain, treasurer, sheriff, coroner, clerk, constable, marshal, etc., with a common council, naming the persons that shall fill such offices until their successors are appointed and qualified; and provides that the aldermen and assistant aldermen shall constitute a common council of the city, and " that they, or the greater part of them shall or may have full power and authority, by virtue of these presents, from time to time, to call and hold common council within the common council house or city hall of the said city; and there as the occasion shall be, to make laws, orders, ordinances and constitutions in writing; and to add, alter, diminish or reform them, from time to time, as to them shall seem necessary and convenient (not repugnant to the prerogative of his most sacred majesty aforesaid, his heirs and successors, or to any of the laws of the kingdom of England, or other of the laws

of the general assembly of the province of New York) for the good rule, oversight, correction and government of the said city and liberties of the same, and of all the officers thereof and for the several tradesmen, victualers, artificers, and of all other the people and inhabitants of the said city, liberties and precincts, aforesaid, and for the better preservation of government, and disposal of all the lands, tenements and hereditaments, goods and chattels of the said corporation; which laws, orders, ordinances and constitutions shall be binding to all the inhabitants of the said city.".

It is quite apparent from a reading of the charter that a local subordinate municipal government was here established, to which the sovereign delegated the powers of local government, not inconsistent with the laws of England or of the province of New York, and to which he conveyed the tideway surrounding the island. While we have no express provision of the charter delegating to the municipality the sovereign power to hold the tideway as trustee for the use of the public and for commerce, and to make laws, rules and regulations with reference thereto, we think this power was intended to be delegated to the municipality, and that such intent is clearly inferable from the provisions of the charter growing out of the general powers given to its common council to make laws, ordinances and constitutions, and to amend the same from time to time as may be deemed necessary, and from the fact that he conveyed to the city the land between high and low-water mark. The conveyance of the tideway to the city interposed a barrier between the body of the river and the uplands which would prevent the sovereign from erecting docks, piers or wharves thereon for the accommodation of commerce, and is inconsistent with the purpose of the sovereign to longer retain jurisdiction, control and management thereof for the interest of the public. We, therefore, are of the opinion that it was the intention of the sovereign to delegate to the municipality the power to hold and control the tideway in the interest of commerce and of the public; and that this is apparent from the fact that the

charter not only conveyed to the city the tideway, but also granted to it the bridge, docks and piers already constructed, with the right to collect wharfage therefrom. If we are right in this conclusion, it follows that the officers of the city, in conveying to De Kay in 1701, did so as the representatives of the sovereign power delegated to it as a municipal government; and it is deemed, therefore, to have intended only to have included in the conveyance the uplands to high-water mark, retaining the tideway and lands under water as trustee of the public domain in the interests of commerce and of the state.

The order should be affirmed, with costs.

Cullen, Ch. J., Gray, O'Brien, Bartlett, Vann and Werner, JJ., concur.

Order affirmed.